UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WISCONSIN FAMILY ACTION,

        Plaintiff,

    v.                                       Case No. 21-C-1373

FEDERAL ELECTION COMMISSION,

        Defendant.

## DECISION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Wisconsin Family Action (WFA) is a non-profit organization whose mission is to advance Judeo-Christian principles and values in Wisconsin by strengthening, preserving, and promoting marriage, family, life, and liberty.  Compl. ¶ 4, Dkt. No. 1.  WFA brought this action under the Federal Election Campaign Act of 1971 (FECA), 52 U.S.C. §§ 30101 *et seq.*, against Defendant Federal Election Commission, alleging that § 30104(c), as interpreted by the FEC, unconstitutionally burdens the free-speech, association, and assembly rights of WFA and its donors.  WFA also asserts that § 30104(c) and its enforcement mechanisms are *ultra vires* and unconstitutional.  The Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1331.

On December 2, 2021, WFA filed a motion for a preliminary injunction requesting that the Court "enjoin the FEC from forcing WFA to disclose under 52 U.S.C. § 30104(c) any contributions other than those that are earmarked for specific independent expenditures expressly advocating the election or defeat of an identified candidate for Federal office."  Dkt. No. 3 at 1.  The Court received briefs from the parties and from Amicus Curiae Citizens for Responsibility and Ethics in

Washington, and heard argument on the motion on February 8, 2022. For the following reasons, WFA's motion for preliminary injunction will be denied.

## RELEVANT STATUTORY AND REGULATORY FRAMEWORK

The FECA regulates campaign financing for federal elective offices in part by requiring disclosures of the identities of persons contributing money and making expenditures to influence federal elections. These required disclosures are "part of Congress' effort to achieve 'total disclosure' by reaching 'every kind of political activity' in order to insure that the voters are fully informed and to achieve through publicity the maximum deterrence to corruption and undue influence possible." *Buckley v. Valeo*, 424 U.S. 1, 76 (1976) (quoting S. Rep. No. 92-299 at 57 (1971)). The FECA additionally reflects Congress' desire to "limit spending in federal election campaigns and to eliminate actual or perceived pernicious influence over candidates for elective office that wealthy individuals or corporations could achieve by financing the 'political warchests' of those candidates." *Akins v. FEC*, 736 F. Supp. 2d 9, 13 (D.D.C. 2010) (quoting *Orloski v. FEC*, 795 F.2d 156, 163 (D.C. Cir. 1986)).

The FECA mandates disclosures from "political committees" and organizations "other than political committees" that make "independent expenditures" above a set level "during a calendar year." 52 U.S.C. §§ 30104(a)–(c). An entity is a "political committee" when it meets certain monetary thresholds for receiving or making contributions or expenditures and the FEC determines it is either under the control of a candidate or its major purpose is the nomination or election of federal candidates. *See Buckley*, 424 U.S. at 79. The FECA defines the term "contribution," as pertinent here, as including "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office . . . ." 52 U.S.C. § 30101(8)(A)(i). The term "expenditure" includes "any purchase, payment,

2

distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office . . . ." 52 U.S.C. § 30101(9)(A)(i).

Candidates, their campaigns, political parties, and other groups that raise or spend more than a minimum in "contributions" or "expenditures" and have as their major purpose the election or nomination of federal candidates are required to report to the FEC on a regular basis detailed information about all receipts and distributions. *See* § 30104(a). Those groups, designated "political committees" by the FECA, are also required to meet additional registrational and organizational requirements. 52 U.S.C. §§ 30102–03. Organizations that, like WFA, have broader purposes, but also spend money to influence federal elections, fall outside the definition of a political committee. Such organizations must also file reports with the FEC and comply with more limited disclosure requirements if they make independent expenditures above a set amount in a calendar year. § 30104(c). The reports are then made accessible to the general public at the FEC's website. 52 U.S.C. § 30112(a).

This case was filed in response to the expansion of donor disclosure requirements under the FECA for non-political organizations, like WFA, that was brought about by *Citizens for Responsibility and Ethics in Washington v. FEC*, 316 F. Supp. 3d 349 (D.D.C. 2018) (*CREW I*), *aff'd*, 971 F.3d 340 (D.C. Cir. 2020). Federal election law requires detailed disclosure of the identity of persons or organizations who spend more than $250 in a calendar year to make an "independent expenditure," defined as an expenditure by a person or organization "expressly advocating the election or defeat of a clearly identified candidate" and "that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents." 52 U.S.C. § 30101(17). Prior to *CREW I*, donor disclosure requirements for so-called "not political

committees," or non-political committees, were governed by 11 C.F.R. § 109.10(e)(1). That regulation required "[e]very person that is not a political committee and that makes independent expenditures aggregating in excess of $250 with respect to a given election in a calendar year" to file a report with the FEC identifying each independent expenditure and the person or organization making it. 11 C.F.R. §§ 109.10(b), (e). Unlike political committees, however, non-political committees were not required to include in their reports to the FEC the identity of every person who donated more than $200 during the reporting period. Under 11 C.F.R. § 109.10(e)(1)(vi), non-political organizations were required to include only "[t]he identification of each person who made a contribution in excess of $200 to the person filing such report, which contribution was made for the purpose of furthering the reported independent expenditure."

In *CREW I*, the court held that 11 C.F.R. § 109.10(e)(1)(vi) was invalid as inconsistent with the FECA's statutory requirements in 52 U.S.C. § 30104(c). Section 30104(c) sets out the reporting requirements for non-political committees. In pertinent part, it states:

(1) Every person (other than a political committee) who makes independent expenditures in an aggregate amount or value in excess of $250 during a calendar year shall file a statement containing the information required under subsection (b)(3)(A) for all contributions received by such person.

(2) Statements required to be filed by this subsection shall be filed in accordance with subsection (a)(2), and shall include--

(A) the information required by subsection (b)(6)(B)(iii), indicating whether the independent expenditure is in support of, or in opposition to, the candidate involved;

(B) under penalty of perjury, a certification whether or not such independent expenditure is made in cooperation, consultation, or concert, with, or at the request or suggestion of, any candidate or any authorized committee or agent of such candidate; and

(C) the identification of each person who made a contribution in excess of $200 to the person filing such statement which was made for the purpose of furthering an independent expenditure.

4

Subsection (b)(3)(A), referenced in § 30104(c)(1), requires the statement to include the identification of each "person (other than a political committee) who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office) . . . ." 52 U.S.C. § 30104(b)(3)(A).

Focusing on the incorporation of subsection (b)(3)(A) in Section 30104(c)(1), the *CREW I* court concluded from its thorough analysis of the statutory text that the FECA unambiguously imposes greater disclosure obligations than those required by 11 C.F.R. § 109.10(e)(1)(vi). 316 F. Supp. 3d at 387–95. Section 109.10 was "[i]n contravention of the broad disclosure that Congress intended when enacting the 1979 FECA Amendments," the court explained, because it "wholly fail[ed] to implement" the disclosure requirement mandated in § 30104(c)(1) and "impermissibly narrow[ed] the mandated disclosure" in § 30104(c)(2)(C). *Id.* at 423. The regulation failed to implement the disclosure requirement in § 30104(c)(1), the court held, because it ignored that subsection's requirement that a non-political committee that makes an independent expenditure sufficient to trigger the statutory reporting duty identify each person who makes a contribution to the reporting committee as required under subsection (b)(3)(A). And the regulation impermissibly narrowed the disclosure mandated by § 30104(c)(2)(C), the court held, because instead of requiring "the identification of each person who made a contribution in excess of $200 to the person filing such statement which was made for the purpose of furthering *an* independent expenditure," as the statute required, the regulation required identification only of those persons whose contributions were made for the purpose of furthering *the reported independent expenditure*." 11 C.F.R. § 109.10(e)(1)(vi) (emphasis added); *CREW I*, 316 F. Supp. 3d at 423. The court therefore vacated § 109.10(e)(1)(vi) but stayed the vacatur for 45 days to allow the FEC

5

to "issue interim regulations that comport with the statutory disclosure requirement of 52 U.S.C. § 30104(c)" consistent with the court's decision. *CREW I*, 316 F. Supp. 3d at 423.

While the FEC did not appeal the district court's decision, an intervenor, Crossroads Grassroots Policy Strategies, filed an emergency motion for a stay pending appeal. The Court of Appeals for the District of Columbia Circuit denied the motion on September 15, 2018, concluding that Crossroads GPS had not established a likelihood of success on the merits or irreparable harm to its legal interests. *Citizens for Responsibility & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1017–19 (D.C. Cir. 2018) (*CREW II*). In weighing the public interest factors, the court found that "where the complained-of disclosure covers only those who donate money *for the intended purpose of influencing an election*, the interest in anonymity does not, for purposes of an exceptional stay, outweigh the individual plaintiff's and the public's countervailing interests in receiving important voting information and in transparency." *Id.* at 1019 (emphasis in original). The Supreme Court also denied the intervenor's request for a stay. *Crossroads Grassroots Policy Strategies v. Citizens for Responsibility & Ethics in Wash.*, 139 S. Ct. 50 (2018) (Mem.).

The FEC did not promulgate new regulations during the 45-day stay allowed by the court in *CREW I*. Instead, the FEC issued a press release on October 4, 2018, entitled "Federal Election Commission, Guidance following U.S. District Court decision in *CREW v. FEC*, 316 F. Supp. 3d 349 (D.D.C. 2018)." Dkt. No. 1-2 (FEC Guidance). The FEC Guidance acknowledged that § 109.10 had been vacated and explained the filing obligations of non-political committees that make independent expenditures in light of *CREW I*.

On August 21, 2020, the D.C. Circuit affirmed the district court, concluding that § 109.10 conflicts with the FECA's "unambiguous terms twice over." *Citizens for Responsibility & Ethics in Wash. v. FEC*, 971 F.3d 340, 350 (D.C. Cir. 2020) (*CREW III*). The court found that

§ 30104(c)(1)'s meaning is readily apparent: "any entity (excluding political committees) that makes over $250 worth of IEs [independent expenditures] in a calendar year must disclose the name of every donor who has given the entity over $200 in the aggregate in 'contributions,' along with the date and amount of each of those contributions." *Id.* at 351. Because the regulation failed to implement § 30104(c)(1)'s unambiguous disclosure requirement, the court held that the regulation was invalid. *Id.* at 354. The court also explained that § 109.10 runs contrary to § 30104(c)(2) because the regulation only required disclosure of the identity of persons whose contributions were made for the purpose of furthering *the* reported independent expenditure, whereas the FECA requires disclosure of any person who contributed for the purpose of furthering *an* independent expenditure. *Id.* at 354–55.

## FACTUAL BACKGROUND

WFA is a non-profit, non-stock corporation organized under Wisconsin law and is exempt from federal income taxation under Internal Revenue Code § 501(c)(4). Compl. ¶ 4. As noted above, its mission is to "advance Judeo-Christian principles and values in Wisconsin by strengthening, preserving, and promoting marriage, family, life, and liberty." *Id.* Although WFA is not a political committee, it asserts that it would "like to support candidates for federal office representing Wisconsin residents in the upcoming election cycle." Am. Appling Decl. ¶¶ 2, 7, Dkt. No. 34. According to WFA's president Julaine Appling, donations received by WFA are "not designated to be used for any specific purpose, and similarly . . . WFA donors have never indicated that their contributions are intended to support a specific candidate or political party." *Id.* at ¶ 9.

Appling asserts that WFA's explicit policy is "not to share, sell, or otherwise disclose its donor lists . . . out of respect for its donors' privacy, and because of real instances of threats, harassment, boycotts, and other retaliation directed over the years at known WFA employees,

supporters and contributors." *Id.* at ¶ 13. Appling explains that WFA employees receive harassing phone calls and letters as well as threatening messages left on their social media accounts and voicemails. *Id.* She notes instances where employees' cars have been keyed and their tires slit. *Id.* She also cites reports of WFA supporters having yard signs promoting traditional marriage that were created by a WFA affiliate destroyed and their car tires slit. *Id.* at ¶ 14. Appling indicates that "WFA has been told by potential donors that they cannot give to [WFA] out of fear that people who oppose WFA's mission might find out and target them and their business." *Id.* at ¶ 16. Broad disclosure under the FECA, Appling asserts, "would be an effective way to quickly destroy an organization like [WFA]." *Id.* at ¶ 17.

The potential for broad disclosure under the FECA prompted WFA to file this action against the FEC. WFA alleges that it has refrained from making independent expenditures in support of candidates for federal office on account of the FEC's current interpretation of § 30104(c). Compl. ¶ 23. Given the vacatur of § 109.10, WFA alleges that it and its donors "lack adequate assurance as to which donations must be reported under Section 30104(c)." *Id.* at ¶ 25. Specifically, WFA contends that the interpretation of § 30104(c) as set forth in the guidance the FEC issued "would require disclosure of donors who give to WFA for reasons that have nothing to do with any candidate or, for that matter, campaigns generally." Dkt. No. 6 at 7. WFA argues that the FEC's interpretation reaches far beyond what is needed to further any significant governmental interest and would expose WFA's donors to intimidation tactics and personal attack by those who disagree with WFA's mission.

WFA thus contends that application of the FEC Guidance to the facts of this case cannot survive the heightened judicial scrutiny required under the First Amendment. With federal elections around the corner, WFA filed its motion for a preliminary injunction to enjoin the FEC

from "forcing WFA to disclose under Section 30104(c) any contributions other than those that are earmarked for specific independent expenditures expressly advocating the election or defeat of an identified candidate for Federal office." Dkt. No. 3 at 1. At the hearing on its motion, however, WFA conceded that it was not challenging its obligation under the FECA to disclose the identity of donors whose contributions are earmarked for independent expenditures in general, as opposed to a specific independent expenditure. Dkt. No. 35 at 18:19–24. Instead, WFA argued that disclosure should only be required for "contributions that are earmarked for activities or communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 19:21–25.

## ANALYSIS

### A. Legal Standard

"A preliminary injunction is an exercise of very far-reaching power, never to be indulged . . . except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (internal quotation marks and citations omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). A plaintiff seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. In First Amendment cases, such as this one, "the likelihood of success on the merits will often be the determinative factor." *Higher Soc'y of Ind. v. Tippecanoe Cty., Ind.*, 858 F.3d 1113, 1116 (7th Cir. 2017) (internal quotation marks and citations omitted).

"The First Amendment prohibits government from 'abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (*AFPF*) (quoting U.S. Const. amend. I). The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Id.* (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). The Court has also recognized that full enjoyment of these rights can include the right to remain anonymous. Indeed, it is "'hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action.'" *Id.* (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)) (alteration in original). In recognizing that compelled disclosures of contributors can infringe the rights of privacy of association and to belief guaranteed by the First Amendment, the Supreme Court held in *AFPF* that statutes requiring compelled disclosure must survive "exacting scrutiny." *Id.* at 2383; *see also Buckley*, 424 U.S. at 66 ("The strict test established by *NAACP v. Alabama* is necessary because compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights.").

Under the exacting scrutiny standard, there must be "'a substantial relation between the disclosure requirement and a sufficiently important governmental interest.'" *AFPF*, 141 S. Ct. at 2383 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). To withstand exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (internal quotation marks and citations omitted). Exacting scrutiny does not require that a disclosure regime "be the least restrictive means of achieving their ends," but it

does require that it be "narrowly tailored to the government's asserted interest." *Id.* As the Supreme Court has recognized:

> In the First Amendment context, fit matters. Even when the Court is not applying strict scrutiny, we still require a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective.

*Id.* at 2384 (quoting *McCutcheon v. FEC*, 572 U.S. 185 (2014)). In other words, where exacting scrutiny applies, "the challenged requirement must be narrowly tailored to the interest it promotes, even if it is not the least restrictive means of achieving that end." *Id.*

## B. WFA's First Amendment Claim

The First Amendment interests asserted by WFA in this case are substantial. "Advocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation." *Buckley*, 424 U.S. at 48. Limitations on political expression are "at the core of our electoral process and of the First Amendment freedoms." *Id.* at 39. Although the Court in *Buckley* held that the FECA disclosure requirements were facially valid and rejected a blanket exemption for minor parties and independents, it recognized that there could be cases in which forced disclosure of donor identities would violate the constitutional rights of supporters of unpopular causes. *Id.* at 68. The Court acknowledged in its discussion of the burdens of disclosure on First Amendment rights that "it is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute" and "[i]n some instances, disclosure may even expose contributors to harassment or retaliation." *Id.* The Court explained that these burdens on individual rights are "not insignificant" and that "they must be weighed carefully against the interests which Congress has sought to promote." *Id.*

"Where it exists," the Court noted, "the type of chill and harassment identified in *NAACP v. Alabama* can be shown." *Id.* at 73. The Court also noted its expectation that courts would be sensitive to similar showings in future cases. *Id.*

WFA has offered, through the declaration of Julaine Appling, evidence of various instances of harassment of WFA's employees and its supporters. Am. Appling Decl. ¶ 13. For example, for roughly two years after WFA supported a state constitutional amendment limiting the definition of marriage to a relationship between a man and a woman in 2006, Appling received a phone call at home every few months in the middle of the night that involved the use of "vulgar, foul language" and warned her that she was "not safe" because she was a "hateful, homophobic, Nazi bitch." *Id.* In 2006, "serious death threats" were made against WFA's political advisor's family. *Id.* In approximately 2013, Appling received a letter, postmarked from Wisconsin, that referenced issues supported by WFA and stated that the sender knew where Appling lived, that the sender lived close by, that later that month Appling would know they were there, and that Appling's life was in danger. *Id.* Appling took the letter to the police, and the police considered the letter a "real threat" and ensured patrol cars were more visible and drove more frequently in her neighborhood for that month. *Id.* Appling also notes that, when WFA's offices were in downtown Madison, WFA employees had their cars keyed, had their vehicle tires slit, and had abusive messages left on their vehicles. *Id.* She asserts that WFA receives harassing social media messages and provided examples of comments posted to WFA's Facebook page in September 2021 after WFA promoted a book on its page. *Id.*; Dkt. No. 34-1. She contends that WFA receives abusive voicemails and highlighted a voicemail from September 2020, in which the caller, who did not identify himself, stated that he disagreed with WFA's position on religious liberty and that WFA should "go f--- yourself" and that WFA employees would "burn in hell" and should "eat s--- and die, you c---."

12

Am. Appling Decl. ¶ 13. In addition, WFA supporters reported having yard signs created by a WFA affiliate that promote traditional marriage destroyed and their car tires slit. *Id.* at ¶ 14.

The FEC, citing *NAACP v. Alabama*, 357 U.S. 449 (1958), asserts that the vague examples WFA has provided "do not remotely rise to the level of threats and harassment sufficient to warrant an exception to the generally applicable disclosure rule." Dkt. No. 20 at 29; *see also ProtectMarriage.com v. Bowen*, 830 F. Supp. 2d 914, 933–36 (E.D. Cal. 2011) (holding that organization supporting California ballot measures to amend state constitution to define marriage as relationship between persons of opposite sex failed to show harassment and retaliation sufficient to justify exemption from public disclosure requirements). In *NAACP*, the organization had "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members [had] exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." 357 U.S. at 462. The record included evidence of a "series of bombings and shootings" and other major acts of violence. *See* Brief for Petitioner, *NAACP v. Alabama*, 357 U.S. 449 (1958), Dkt. No. 91, 1957 WL 55387, at *16 n.12. But while WFA's examples of harassment are not the types of violent abuses cited in *NAACP v. Alabama*, actual instances of violence are not necessary to chill speech. *AFPF*, 141 S. Ct. at 2381.

The FEC also asserts that WFA has not shown that the harassment it has been subjected to is related in any way to campaign finance disclosures and that much of the harassment has been targeted toward WFA's staff after it took various actions consistent with its stated purpose. In support of this argument, the FEC points to the publicly filed Wisconsin campaign finance reports for Wisconsin Family Action PAC from 2010 to 2021, which lists the names and addresses of donors of amounts as low as $20, and WFA's own campaign finance reports from 2016 to 2021.

13

Dkt. Nos. 21-4 & 21-5. The FEC notes that WFA "cites no specific examples of retaliation resulting from its state-law disclosures." Dkt. No. 20 at 33.

A review of WFA's state filings, however, reveals how few donors WFA has disclosed with almost all donations disclosed of $25 or less. Of those it has disclosed, few if any have been willing to list their employers or occupation, whether due to fear of retaliation or because they're retired and no longer as vulnerable to employment-related intimidation. And while it is true that much of the evidence of harassment presented by WFA was experienced by its employees, WFA also cited reports of harassment experienced by WFA's supporters. The fact that the few small donors WFA has disclosed in the past may not have suffered significant harassment does not mean that other prospective donors do not reasonably fear retaliation were their identities publicly disclosed. Indeed, Appling states in her declaration that "over the years, donors have advised WFA that if their names are ever disclosed, they cannot continue to give money because their business or families would be threatened by those opposed to WFA's mission." Am. Appling Decl. ¶ 15. There is no reason to think that donors, who share the same views as WFA, would be treated differently or would not be subject to the same harassment experienced by WFA's employees should they be known.

The Court in *Buckley* cautioned against demanding "unduly strict requirements of proof" of harassment before exempting unpopular or minority groups from statutory duties to disclose their donors. 424 U.S. at 73–74. Concerned that requiring donors fearful of reprisal to submit affidavits identifying themselves would defeat the purpose of seeking nondisclosure, the Court noted such parties "must be allowed sufficient flexibility in the proof of injury to assure fair consideration of their claim." *Id.* at 74. The evidence offered to support exemption, the Court held, "need show only a reasonable probability that the compelled disclosure of a party's

14

contributors' names will subject them to threats, harassment, or reprisals from Government officials or private parties." *Id.* Examples of the type of proof sufficient to succeed on an as-applied challenge include "specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself," or a "pattern of threats or specific manifestations of public hostility." *Id.* In addition, "[n]ew parties that have no history upon which to draw may be able to offer evidence of reprisals and threats directed against individuals or organizations holding similar views." *Id.*

In some respects, and for certain groups, the risks associated with disclosing their donors' participation in constitutionally protected speech have only increased since *Buckley* was decided. As Justice Thomas has observed, "the advent of the Internet enables prompt disclosure of expenditures, which provides political opponents with the information needed to intimidate and retaliate against their foes." *Citizens United v. FEC*, 558 U.S. 310, 484 (2010) (Thomas, J., concurring in part and dissenting in part) (internal quotation marks and brackets omitted); *see also Doe v. Reed*, 561 U.S. 186, 203–12 (2010) (Alito, J., concurring). The accessibility of the Internet and the rise of "cancel culture" are major developments since *Buckley*. Cancel culture is the phenomenon of aggressively targeting individuals or groups, whose views aggressors deem unacceptable, in an effort to destroy them personally and/or professionally. Cancel culture, a prominent force in today's world, is inconsistent with the philosophy of open, political debate; it undermines and stifles First Amendment privileges.

There is no doubt that WFA's mission and values are detested by certain groups. Profound understandings and traditions about the nature of marriage and human sexuality that grounded western civilization for centuries are today deemed offensive and hateful by many. For "real-world" instances of the kind of retaliation and intimidation groups with similar views as WFA

15

have suffered in the country, one need only look to Justice Thomas's account in *Citizens United v. FEC*. 558 U.S. 310, 480–85 (2010) (Thomas, J., concurring in part and dissenting in part) (observing that some opponents to Proposition 8 [California's referendum on "same-sex marriage"] created websites with maps showing the locations of homes or businesses of Proposition 8 supporters; supporters and customers suffering property damage or threats of physical violence or death; supporters receiving envelopes through the mail containing a white powdery substance; and supporters being forced to resign from their positions of employment). An individual who wants to participate in politics should not have to face personal and professional ruin. *See id.* at 485 ("I cannot endorse a view of the First Amendment that subjects citizens of this Nation to death threats, ruined careers, damaged or defaced property, or pre-emptive and threatening warning letters as the price for engaging in core political speech, the primary object of First Amendment protection." (internal quotation marks and citation omitted)). "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP*, 357 U.S. at 462 (citation omitted).

For these reasons and based on this evidence, WFA argues that compelled disclosure of its contributors is likely to affect adversely the ability of WFA and its members "to pursue their collective effort to foster belief which they admittedly have the right to advocate." *Id.* at 462–63. The disclosure requirements arguably called for under the FEC's current guidance, WFA contends, would chill the exercise of the constitutionally protected rights of WFA and its donors, and thereby threaten WFA's existence, unless WFA declines to make any independent expenditures of more than $250 in the coming elections.

**C. Disclosure Requirements under § 30104(c)**

In order to assess WFA's argument that the disclosure requirements of § 30104(c) violate the First Amendment rights of WFA and its donors, it is first necessary to determine which donors WFA is required to disclose under that section, an issue on which the parties are in significant disagreement.  At the outset, it is important to note that WFA does not dispute its obligation under the FECA to disclose its own independent expenditures expressly advocating for a specific electoral result, together with the relevant details of such expenditures.  These include "the date, amount, and purpose of any such independent expenditure and a statement which indicates whether such independent expenditure is in support of, or in opposition to, a candidate, as well as the name and office sought by such candidate, and a certification, under penalty of perjury, whether such independent expenditure is made in cooperation, consultation, or concert, with, or at the request or suggestion of, any candidate or any authorized committee or agent of such committee."  52 U.S.C. § 30104(b)(6)(B)(iii); *see also* § 30104(c)(2)(A).  WFA likewise does not dispute its obligation to disclose donors who contribute more than $200 and affirmatively earmark their contribution for activities or communications that expressly advocate the election or defeat of a clearly identified candidate.  Thus, at least at this stage of the litigation, WFA implicitly concedes that the public interest in disclosing contributors who earmark their contributions for independent expenditures outweighs its interest in confidentiality.  The dispute is over which of its additional donors or contributors WFA must disclose.

WFA contends that, under the FEC Guidance issued after *CREW I*, it would be required "to publicly disclose all donors giving as little as $200 in one year if the organization makes even a single political expenditure, independent of any candidate, campaign or political party, of as little as $250 in the same year."  Dkt. No. 6 at 7.  The FEC, on the other hand, denies that the disclosure

requirements of § 30104(c) are as broad as WFA contends. The disagreement centers on what the term "contributions" means under the FECA.

As noted above, the FECA defines the term "contribution," as relevant here, to mean "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). In rejecting a vagueness challenge to FECA's disclosure provisions, the Supreme Court in *Buckley* construed the phrase "to include not only contributions made directly or indirectly to a candidate, political party, or campaign committee" but also "contributions made to other organizations or individuals but earmarked for political purposes." 424 U.S. at 78. The FEC has incorporated this definition, as construed by *Buckley*, in its post-*CREW* guidance on the application of § 30104(c). The FEC Guidance issued after *CREW I* reads in relevant part:

> "[S]ubsection (c)(1) applies to '*all* contributions received by such' reporting not-political committee, 52 U.S.C. § 30104(c)(1) (emphasis added) and . . . requires disclosure of donors of over $200 annually making contributions 'earmarked for political purposes,' *Buckley*, 424 U.S. at 80, 96 S. Ct. 612, which contributions are 'intended to influence elections,' *MCFL*, 479 U.S. 262, 107 S. Ct. 616; *see also* 52 U.S.C. § 30101(8)(A)(i) (defining a 'contribution' as any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office')." *CREW v. FEC*, 316 F. Supp. 3d 349, 389 (D.D.C. 2018).

> "[S]ubsection (c)(2)(C) requires reporting not-political committees to identify those donors of over $200 who contribute 'for the purpose of furthering *an* independent expenditure.' *Id.* § 30104(c)(2)(C) (emphasis added). These donors are a subset of those contributors required to be identified in subsection (c)(1). Consequently, subsection (c)(2)(C) does not require that a reporting not-political committee disclose information about the date or amount of the contributions covered by this paragraph, as that information about the donors is already to be reported under (c)(1)." *CREW v. FEC* at 389.

> "Subsection (c)(2)(C) is properly read to cover contributions used by the not-political committee for express advocacy for or against the election of a federal candidate, whereas subsection (c)(1) covers contributions used for other political purposes in support or opposition to federal candidates by the organization for

18

contributions directly to candidates, candidate committees, political party committees, or super PACs." *CREW v. FEC* at 392.

FEC Guidance at 4–5.

The FEC's written guidance does little to alleviate WFA's concerns. The phrases "for the purpose of influencing any election for Federal office" and "earmarked for a political purpose" are so broad that they could include virtually anyone who donated to an issue advocacy organization such as WFA. Issue advocacy, as distinct from advocacy for or against a particular candidate, is not what the FECA is intended to regulate. *See FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 477 (2007) ("[W]e reject the contention that issue advocacy may be regulated because express election advocacy may be, and 'the speech involved in so-called issue advocacy is [not] any more core political speech than are words of express advocacy.'" (quoting *McConnell v. FEC*, 540 U.S. 93, 205 (2003)) (alteration in original)). And by looking to what fungible contributions are "used for" instead of what they are "earmarked for," the FEC Guidance ignores the key element that makes contributions received by non-political organizations reportable in the first place—the intent of the donor.

WFA cites *FEC v. Survival Education Fund* for the proposition that groups like WFA "in some sense use all contributions 'for political purposes,'" and thus "will be at a loss to know when a solicitation triggers FECA disclosure requirements and subjects them to potential civil penalties." 65 F.3d 285, 294 (2d Cir. 1995). In *Survival Education Fund*, the court drew on *Buckley*'s narrowing construction of the term "expenditures" as used in the FECA to construe "contributions intended for political purposes" to mean "contributions that are earmarked for activities or 'communications that expressly advocate the election or defeat of a clearly identified candidate.'" *Id*. at 295 (quoting *Buckley*, 424 U.S. at 80). WFA urges the Court to adopt the same construction here. "By similarly limiting the additional disclosure required by WFA under Subsection (c)(1)

19

with this express advocacy principle from *Survival* (and *Buckley*)," WFA argues, "this Court can construe Section 30104(c) in a way that will not infringe the First Amendment rights of WFA and its donors, and will provide clear guidance regarding the scope of disclosure required from WFA." Dkt. No. 6 at 26.

The FEC opposes WFA's request, even as modified, noting for example that it would exclude from disclosure donors who contributed vast sums in response to solicitations for contributions to elect unnamed Democrats or Republicans. Dkt. No. 35 at 34:15–23. WFA's proposed construction would also exclude from disclosure donors who contributed in response to explicit solicitations for election-related spending. This was precisely the problem the court addressed in *CREW*. *CREW III* recognized that a significant number of independent expenditure spending comes from § 504(c)(4) organizations that do not disclose their contributors and that those entities that do not disclose their own underlying donors "can serve as a kind of pass-through, non-disclosure vehicle." 971 F.3d at 344–45. The entity at issue there, Crossroads GPS, had made over $100 million worth of independent expenditures and over $75 million in contributions to other independent expenditure making entities since its creation in 2010. *Id.* at 345. To construe § 30104(c) as WFA suggests would reopen the very door that *CREW* closed and undermine an essential goal of the FECA. *See also FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986) (rejecting argument that allowing nonprofit corporations to make independent expenditures would open the door to massive undisclosed political spending by similar entities because such entities "will be required to identify all contributors who annually provide in the aggregate $200 in funds intended to influence elections").

The alternative, the FEC argues, is not, as WFA contends, that it must choose between foregoing its constitutional right to make independent expenditures and disclosing all its donors,

thereby subjecting them to possible retaliation and harassment. The FEC does not view § 30104(c)'s disclosure requirements so broadly. Under the FEC's interpretation of the statute, WFA will not be required to disclose all donors simply because it makes independent expenditures aggregating more than $250 with respect to a given election in a calendar year. As explained by its attorney at the hearing on WFA's motion, a non-political organization, like WFA, that makes independent expenditures exceeding $250 must disclose only those donors whose contributions are earmarked for political purposes and are tied to a federal election. Dkt. No. 35 at 31:12–25, 34:8–35:13. Absent such an earmark and tie, the donor need not be disclosed.

Given the FEC's interpretation of the statute, it is difficult to see how WFA will be harmed by denying it the relief it seeks. It is to that issue that the Court now turns.

## D. Irreparable Harm

Fearing that its donors would be subject to harassment and retaliation if their identities were known, WFA seeks a preliminary injunction to enjoin the FEC from requiring it to disclose the identities of those who contribute to its mission. But from what WFA has disclosed about its donors, it appears clear that the FEC will not seek disclosure of their identities whether the Court enters such an injunction or not.

WFA describes itself as a nonprofit, nonstock corporation organized under Wis. Stat. § 181 and exempt from federal income taxation under I.R.C. § 501(c)(4). WFA is not a political action committee or an "independent expenditure committee." Am. Appling Decl. ¶ 2. WFA engages in activities intended to educate voters on issues that relate to its mission and on candidates and their positions on those issues. It carries out its educational activities through disseminating literature, email, texts, flyers, direct mail, telephone calls, and other means. *Id.* at ¶ 5. WFA's typical annual budget is in the range of $800,000 and only once exceeded $1 million. *Id.* at ¶ 8. According to

Appling, "donations received by WFA are not designated to be used for any specific purpose and, similarly, to my knowledge, WFA donors have never indicated that their contributions are intended to support a specific candidate or political party." *Id.* at ¶ 9. WFA spends the contributions it receives and does not pass on money to other organizations, nor does it conduct its activities in coordination with any candidate, campaign, or political party. It has no intention of ever changing these policies. *Id.* at ¶¶ 10, 12.

If, as WFA contends, none of its donors earmark their contributions for a political purpose tied to a particular federal election, then it appears clear that the FEC will not seek their disclosure. While third parties, such as CREW, remain free to seek disclosure, they are not parties to this action and thus this Court is unable to grant relief that would affect them in any event. But based on the FEC's interpretation of § 30104(c), the FEC will not require WFA to disclose all of its donors simply because it makes independent expenditures exceeding $250 in a calendar year.

This is not to say that there may not be circumstances under which the FEC will seek disclosure of WFA's donors. As the parties discussed during argument on WFA's motion, whether a contribution is earmarked for political purposes and tied to an election can depend on whether the contribution is in response to a solicitation and the way the solicitation is worded. Dkt. No. 35 at 34:8–25. It is unclear from WFA's complaint and moving papers, however, what kind of solicitations it intends to send to prospective donors. As a result, it is not possible for the FEC to say at this point whether donors responding to such solicitations should be disclosed.

This problem highlights the difficulty the Court has encountered in addressing WFA's motion. In its motion for a preliminary injunction, WFA requested the Court "to enjoin the FEC from forcing WFA to disclose under 52 U.S.C. § 30104(c) any contributions other than those that are earmarked for specific independent expenditures expressly advocating the election or defeat of

22

an identified candidate for Federal office." Dkt. No. 3 at 1. But in its briefing and at oral argument, WFA retreated from that request and asked the Court to adopt the narrowing construction of the term "contribution" adopted by the Second Circuit in *Survival Education Fund*. *See* 65 F.3d at 293. The Second Circuit had adopted the narrowing construction to avoid uncertainty as to the application of an FECA provision requiring certain disclaimers on any direct mailing that "solicits any contribution." *Id.* Absent a general exemption from the contributor disclosure requirements, which WFA has not sought, or more specific information as to the language it intends to use in its solicitations, the Court is ill equipped and without authority to provide an advisory opinion as to whether disclosure will be required. WFA may be better served by utilizing the FEC's advisory opinion process regarding such matters to the extent it wishes to assure its donors that their identities will not be disclosed. *See The Advisory Opinion Process*, FEC, https://www.fec.gov/legal-resources/advisory-opinions-process/ (last visited Mar. 21, 2022).

In sum, while the First Amendment interests of WFA and its donors at stake in this case are substantial, WFA has failed to make a showing that it would suffer irreparable harm if its motion for a preliminary injunction is denied. Contrary to WFA's contention, it need not refrain from spending more than $250 on independent expenditures in order to protect the identities of its donors. And while the timing and wording of its solicitations of contributions may trigger a duty to disclose donors who respond to such solicitations, the record is not sufficiently developed to permit the kind of relief WFA has requested.

## CONCLUSION

For the foregoing reasons, WFA's motion for a preliminary injunction (Dkt. No. 3) is **DENIED**. WFA's Rule 7(h) expedited, non-dispositive motion to expedite disposition of the

preliminary injunction motion (Dkt. No. 12) is **GRANTED**.  The Clerk is directed to set this matter

for a Rule 16 scheduling conference to discuss further proceedings.

       **SO ORDERED** at Green Bay, Wisconsin this 22nd day of March, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge